## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

WV ASSOCIATION OF CLUB OWNERS
AND FRATERNAL SERVICES, INC.,

                    Plaintiff,

v.                                        CIVIL ACTION NO.  2:07-cv-00122

JOHN C. MUSGRAVE, *in his official capacity
as Director of the State Lottery*

                    Defendants.


### MEMORANDUM OPINION AND ORDER

Pending before the court is the plaintiff's Motion for a Preliminary Injunction [Docket 2]. The issue presented is whether the ban on limited video lottery advertising imposed by the Limited Video Lottery Act violates the plaintiff's First Amendment right to freedom of speech. As a doctrinal matter, the advertising ban does not directly and materially advance a substantial government interest, and is therefore an impermissible restriction on commercial speech under the First Amendment. The advertising ban infringes upon the limited video lottery retailers' right to speak and impedes the public's ability to engage in informed political discourse.

For these and the reasons set forth below, the motion is **GRANTED.**

### I. Factual and Procedural Background

#### A. History of Lottery Regulation

Analysis of the legal arguments in this case is aided by a brief discussion of the history of

electronic video lottery machines in West Virginia.[1] From 1863 to 1984, the West Virginia Constitution imposed a categorical ban on all lotteries. *Club Ass'n of W. Va. v. Wise* (*Club Ass'n I*), 156 F. Supp. 2d 599, 601-04 (S.D. W. Va. 2001), *aff'd* (*Club Ass'n II*), 293 F.3d 723 (4th Cir. 2002). In 1983, the West Virginia Legislature approved a state-run lottery amendment, and on November 6, 1984, it was ratified by referendum. *Id.* at 604. The amendment created an exception to the lottery ban by allowing the Legislature to "authorize lotteries which are regulated, controlled, owned and operated by the State of West Virginia in the manner provided by general law." W. Va. Const. art. VI, § 36. As noted by Judge Haden in *Club Ass'n I*, "[f]rom its humble beginning with a latex scratch-off ticket game in January 1986, the Legislature and the Lottery Commission have gradually expanded on the concept such that the Lottery is now a prime source of much needed revenue for the State." 156 F. Supp. 2d at 605.

The West Virginia State Lottery Commission ("Commission") sought to further expand the lottery in 1993 by introducing video lottery games through a pilot program at Mountaineer Park Thoroughbred Racetrack. *Id.* at 605. The Commission's plans were thwarted, however, when the West Virginia Supreme Court of Appeals held that the Legislature had not enacted general laws for the regulation, control, ownership, and operation of video lottery. *W. Va. ex rel. Mountaineer Park, Inc. v. Polan*, 438 S.E.2d 308, 317-18 (W. Va. 1993). The court also held that the Legislature failed to prescribe adequate standards in the State Lottery Act to guide the Commission with respect to video lottery. *Id.* Consequently, the Commission was without authority under the West Virginia

---

[1] For a more complete history of the regulation of gambling devices and lotteries in West Virginia, see *Club Ass'n of West Virginia v. Wise* (*Club Ass'n I*), 156 F. Supp. 2d 599 (S.D. W. Va. 2001), *aff'd* (*Club Ass'n II*), 293 F.3d 723 (4th Cir. 2002). I will limit my discussion in this case to electronic video lottery machines.

Constitution to establish electronic video lottery. *Id.* The court in *Polan* also questioned whether video lottery was actually a "lottery" as contemplated by the state-run lottery exception in West Virginia Constitution. *Id.* at 316.

The Legislature quickly responded to *Polan* and enacted the Racetrack Video Lottery Act, W. Va. Code §§ 29-22A-1 to -19 (2004). In the Act, the Legislature found that the video lottery games authorized by the legislation were lotteries as used in the West Virginia Constitution. W. Va. Code § 29-22A-2(a).  The Legislature also found that

> the state can control, own and operate a video lottery by possessing a proprietary interest in the main logic boards, all erasable, programmable read-only memory chips used in any video lottery equipment or games, and software consisting of computer programs, documentation, and other related materials necessary for the video lottery system to be operated.

W. Va. Code § 29-22A-2(b).

The Racetrack Video Lottery Act did not address the illegal video lottery machines that existed in abundance in private establishments other than racetracks. *Club Ass'n I*, 156 F. Supp. 2d at 606.  According to the *Census of Gray Poker Machines*, a report submitted to a special committee of the Legislature charged with studying gaming, about 10,000 so-called "gray" machines[2] were found in private establishments across West Virginia in 1999. *Id.* This number increased to 13,524 by early 2001. *Id.* at 607.

Also in 2001, Governor Robert E. Wise, Jr., in his State of the State Address, advocated legalizing and regulating video lottery machines. His proposal was to "reduce, restrict and regulate the gray machines" and "provide a steady new stream of income to finance the PROMISE

---

[2] A "gray" machine is a video terminal that is capable of providing play for games of chance. *Club Ass'n I*, 156  F. Supp. 2d at 606 n.9.

Scholarship, other education efforts and the infrastructure necessary to build West Virginia." *Id.* After vigorously debating the video lottery issue, the Legislature enacted the Limited Video Lottery Act (LVLA), W. Va. Code §§ 29-22B-101 to -1903 (2004 & Supp. 2007). "The avowed purpose of this law was to establish a single state owned and regulated video lottery thus allowing the State to collect revenue therefrom, control the operators of the machines, and stem the proliferation of gambling in the State." *Club Ass'n II*, 293 F.3d at 724. Like the Racetrack Video Lottery Act, the LVLA contained legislative findings regarding the legality of the new "limited" video lottery under the West Virginia Constitution. The Legislature found that the limited video lottery created by the LVLA was a "lottery" as the term is used in the West Virginia Constitution. W. Va. Code § 29-22B-201(2). Similarly, the State could control, own and operate the limited video lottery by possessing a proprietary interest in the limited video lottery game software. W. Va. Code § 29-22B-202(1).

The Supreme Court of Appeals of West Virginia addressed the constitutionality of the LVLA and Racetrack Video Lottery Act in *West Virginia ex rel. Cities of Charleston and Huntington v. West Virginia Economic Development Authority* (*Development Authority*), 588 S.E.2d 655 (W. Va. 2003). The court first held that both racetrack video lottery and limited video lottery, as defined by the relevant statutes, satisfied the West Virginia Constitution's "broad definition of lottery." *Id.* at 669. The court further held that the State's proprietary interest in the video lottery machine's "main logic boards," "erasable, programmable read-only memory chips" and "software" was a sufficient degree of ownership "to bring the video lottery within the scope of the exception for authorized lotteries in W. Va. Const., Art. VI, § 36"; absolute ownership of the video lottery machines was not required. *Id.* at 669-70. Having held that video lottery was a "lottery" and was sufficiently regulated, controlled, owned, and operated by the State, the West Virginia Supreme Court of Appeals held that

video lottery authorized by the LVLA and Racetrack Video Lottery Act fell within the exception for state-run lotteries under article VI, section 36 of the West Virginia Constitution. *Id.* at 670.

Although the LVLA and Racetrack Video Lottery Act were sufficiently similar for their constitutionality to be addressed simultaneously in *Development Authority*, the two statutes are not identical. The Racetrack Video Lottery Act allows a racetrack to advertise and promote its video lottery advertising, so long as the racetrack obtains the prior written approval of the director of the Commission. W. Va. Code § 29-22A-9(f)(12). The LVLA, on the other hand, prohibits a limited video lottery retailer from conducting advertising or promotional activities. W. Va. Code § 29-22B-702(13). The LVLA also forbids the "use of the words 'video lottery' in the name of the approved location, or in any directions or advertising visible from outside the retailer's establishment." W. Va. Code § 29-22B-702(14).

The corresponding legislative rules define "advertisement" as "a media advertisement, an outdoor sign, or a sign inside the licensee's premises that may be seen from the outside of the premises, that conveys to the average reader or hearer that limited video lottery gaming is available at the retail establishment or from the licensed operator." W. Va. Code R. § 179-5-2.1 (2004). The rules also state that "[a] limited video lottery licensed retailer shall not use words commonly associated with gambling either in its corporation name or in its doing-business-as name." W. Va. Code R. § 179-5-33.4 (2004). Similarly, "a limited video lottery licensed retailer shall not use gambling symbols, including but not limited to playing cards, roulette wheels, slot machines, or dice on any sign or in any directions or advertising visible from outside the licensed retailer's establishment." W. Va. Code R. § 179-5-33.5 (2004). The LVLA and its associated rules do not, however, bar all mention of limited video lottery. Limited video lottery retailers "may display a sign

on the exterior of the establishment that states 'West Virginia Lottery Products available here.'" W. Va. Code R. § 179-5-33.2 (2004). This sign, provided by the Commission, must be of uniform size and be no greater than twelve inches by twelve inches in size. W. Va. Code R. § 179-5-33.6 (2004). Finally, the rules provide that "[n]othing contained in this section prohibits the advertising on radio and television of scratch off 'instant' lottery games, online numbers games such as powerball, racetrack video lottery games or new lottery games other than limited video lottery games." W. Va. Code R. § 179-5-33.6 (2004).

### B. Procedural History

The plaintiff, the West Virginia Association of Club Owners and Fraternal Services, Inc., is a West Virginia corporation whose members are licensed limited video lottery ("LVL") retailers. (First Am. Compl.¶ 4.) On February 27, 2007, the plaintiff filed a complaint and a motion for a preliminary injunction against the West Virginia State Lottery Commission (the "Commission") and John C. Musgrave in his official capacity as Director of the State Lottery. On August 20, 2007, the Commission was dismissed from the case, leaving Mr. Musgrave, acting in his official capacity, as the sole defendant.

The plaintiff's members seek to advertise their legal limited video lottery machines but refrain from doing so because violations of the LVLA's advertising restrictions render them subject to civil penalties ranging from one hundred dollars for a first violation to one thousand dollars for a second violation, five thousand dollars for a third violation, and an additional five thousand dollars for each subsequent violation. (Pl.'s Mem. 4 (citing W. Va. Code § 29-22B-1602(f) (2004).) The plaintiff asserts that the restrictions on promotion and advertising by LVL retailers imposed by the LVLA, W. Va. Code § 29-22B-702(13) to (14), and implemented, clarified, and explained in the

legislative rules, W. Va. Code R. § 179-5 *et seq,* violate the plaintiff's rights as guaranteed by the First and Fourteenth Amendments of the United States Constitution and Article III, Section 7 of the West Virginia Constitution. The plaintiff seeks injunctive and declaratory relief to redress and remedy the violation, and to prevent irreparable harm and future violations of its rights.

The plaintiff argues that the advertising in which its members wish to engage is commercial speech, and that the restrictions imposed upon this speech fail to survive application of the test set forth by the Supreme Court in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). (Pl.'s Mem. 7-10.) The defendant makes several arguments in response. First, the defendant argues that any advertising or promotion of limited video lottery machines is government speech and therefore not subject to *Central Hudson* analysis. (Def.'s Mem. in Opp. 5.) The defendant also distinguishes *Central Hudson* and its progeny on the grounds that unlike those cases, in the instant case the State has a proprietary interest in the underlying product, i.e., the limited video lottery. (Def.'s Mem. in Opp. 2–3.) Finally, the defendant argues that the first prong of *Central Hudson* is not met because at least some of the speech at issue is misleading. (Def.'s Mem. in Opp. 2.)

## II. Standard of Review

A motion for a preliminary injunction is governed by the "balance of hardships" test set forth in *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189, 195-96 (4th Cir. 1977), and reiterated in *Direx Isreal, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 812-13 (4th Cir. 1992). In deciding whether to issue a preliminary injunction, a court must consider "(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the requested relief is granted, (3) the likelihood that the

plaintiff will succeed on the merits, and (4) the public interest." *Direx Israel, Ltd.,* 952 F.2d at 812. The plaintiff bears the burden of showing that each of the four factors supporting the issuance of a preliminary injunction is met. *Id.*

Ordinarily, the court should first address the balance of the harms by determining whether the plaintiff is likely to suffer some irreparable harm absent an injunction, and if so, whether the harm to the plaintiff outweighs the potential harm to the defendant should an injunction be issued. *Manning v. Hunt*, 119 F.3d 254, 263-64 (4th Cir. 1997). Here, however, the irreparable harm the plaintiff alleges is inseparably linked to its claim that its First Amendment right to freedom of speech has been violated. *See Elrod v. Burns,* 427 U.S. 347, 373 (1976) ("[L]oss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury."). Therefore, to properly address the plaintiff's claim of irreparable injury, I must first determine the plaintiff's likelihood of succeeding on the merits of its First Amendment claims. *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 511 (4th Cir. 2002).

**III. Discussion**

**A. Likelihood of Success on the Merits**

The success of the plaintiff depends on the classification of the speech at issue in this case. Thus, I must first determine whether limited video lottery advertising is government speech or private speech. If I determine that the speech is private, I must then decide whether the restrictions are constitutionally permissible when subjected to the intermediate scrutiny of the commercial speech test.

1. Government Speech

In cases where there is disagreement over who is speaking, "classify[ing] the relevant message as either government speech or private speech" is the usual first step. *Planned Parenthood of S.C., Inc., v. Rose*, 361 F.3d 786, 792 (4th Cir. 2004). If the advertising[3] restrictions imposed on LVL retailers involve an attempt by the State to promote a message and to ensure that the message is not distorted, then the advertising restriction would be deemed "government speech." *See Griffin v. Dep't of Veterans Affairs*, 274 F.3d 818, 822 (4th Cir. 2001). On the other hand, if the State acts as a regulator rather than as a speaker, then the advertising restrictions would be analyzed as limitations on the private speech of LVL retailers. *See Sons of Confederate Veterans, Inc. v. Comm'r of the Va. Dep't of Motor Vehicles (SCV)*, 288 F.3d 610, 618 (4th Cir. 2002) (describing the relevant inquiry as whether the government is "speaking" or whether it is regulating private speech).

The significance of the distinction between government speech and private speech is the level of control the government can exercise over the content of the speech. When the government is the speaker it may "choose and tailor its message." *SCV*, 288 F.3d at 617. The government's power to choose and tailor its message includes the "discretion to promote policies and values of its own

---

[3] The term "advertising," unless otherwise indicated, will be used in this opinion to cover not only limited video lottery advertising and promotions, but also the use of gambling terms in the corporate names of LVL retailers and the use of gambling symbols by LVL retailers, both of which are prohibited by the legislative rules. W. Va. Code R. § 179-5-33.4, -33.5. That is, when I discuss the State's limitations on advertising, I am referring to the statutory prohibitions on advertising in W. Va. Code § 29-22B-702 and the limitations on the actions of LVL retailers contained in W. Va. Code R. § 179-5-33.1 to -33.5. This broad use of the term "advertising" is justified by convenience and the fact that the restrictions on the use of gambling terms and symbols were apparently put in place out of a desire to prevent LVL retailers from indirectly advertising via the use of their corporate names or symbols. *See* Governor's Exec. Order No. 21-03, Oct. 29, 2003, http://www.state.wv.us/ lottery/exectorder.htm (last visited September 26, 2007) (imposing restrictions the use of gambling terms in corporate names and the use of gambling symbols in order to "curtail improper and illegal advertising activities"). When I find it necessary to treat the various speech restrictions separately, I will so indicate.

choosing free from forum analysis or the viewpoint-neutrality requirement." *Chiras v. Miller*, 432 F.3d 606, 613 (5th Cir. 2005).  In contrast, the government's ability to regulate private speech is limited. For example, "the government may not discriminate based on viewpoint when it regulates private speech." *Planned Parenthood of S.C.*, 361 F.3d at 792.

### a. Development of the Government Speech Doctrine

The wellspring of the government speech doctrine is *Rust v. Sullivan*, 500 U.S. 173 (1991). In *Rust*, federal funds were used to establish clinics where patients could receive family planning advice. *Id.* at 178-81. Congress, however, forbade doctors employed by the program from discussing abortion with their program patients because it "did not consider abortion to be within its family planning objectives." *Legal Servs. Corp. v. Velazquez (LSC)*, 531 U.S. 533, 544 (2001) (citing *Rust*, 500 U.S. at 179-80). The doctors challenged the restriction, arguing, among other things, that it constituted impermissible viewpoint discrimination in violation of the First Amendment. *Rust*, 500 U.S. at 192. The Court rejected this argument and held that the restrictions on abortion advice did not violate the First Amendment. *Id.* at 203.  In rejecting the plaintiffs' viewpoint-discrimination argument, the Court reasoned that the Government was not discriminating based on viewpoint, but rather "it has merely chosen to fund one activity to the exclusion of the other." *Id.* at 193. Moreover, "when the Government appropriates public funds to establish a program it is entitled to define the limits of that program." *Id.* at 194.

The phrase "government speech" does not appear in the *Rust* opinion, but later Courts have explained its result on the grounds that the doctors' counseling activities were government speech. *LSC*, 531 U.S. at 541.  The rule derived from *Rust* is that "[w]hen the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to

ensure that is message is neither garbled nor distorted by the grantee." *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 833 (1995). As noted previously, this allows the government to take actions that would otherwise violate the First Amendment, such as discriminating based on viewpoint. *SCV*, 288 F.3d at 618 ("[E]ven ordinarily impermissible viewpoint-based distinctions drawn by the government may be sustained where the government itself speaks or where it uses private speakers to transmit its message."). The rationale for allowing the government to act in such a way is that when the government speaks, it is accountable to the electorate. If the public does not like the government's message, it can select officials who will espouse a different one. *Bd. of Regents of the Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000).

The government speech analysis was further developed in *Legal Services Corp. v. Velazquez (LSC)*, 531 U.S. 533 (2001). *LSC*, like *Rust*, involved a federal subsidy program where funds came with strings attached. In *LSC*, the grant money was used to provide legal assistance to those financially unable to afford representation. *Id.* at 536. As a condition of accepting the funds, the grantees were prohibited from representing clients "if the representation involve[d] an effort to amend or otherwise challenge existing welfare law." *Id.* at 536-37. Unlike *Rust*, however, when a group of LSC lawyers argued that the prohibition impermissibly discriminated based upon viewpoint, the Supreme Court agreed and held that it violated the First Amendment. *Id.* at 537. The Court was unable to label the advice from attorney to client "governmental speech even under a generous understanding of the concept." *Id.* at 542-43. In the *LSC* situation there was "no programmatic message of the kind recognized in *Rust* and which sufficed there to allow the government to specify the advice deemed necessary for its legitimate objectives." *Id.* at 548. In addition, "the LSC program was designed to facilitate private speech, not to promote a governmental message." *Id.* at 542.

-11-

Recently, the Supreme Court again addressed the government speech doctrine, albeit in a case involving a compelled subsidy. In *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550 (2005), the issue was "whether a federal program that finances generic advertising to promote an agricultural product violates the First Amendment." *Id.* at 553. The plaintiffs, associations whose members subsidize the advertising, argued that they could not, consistent with the First Amendment, be forced to subsidize a message with which they disagreed. *Id.* at 555. In addressing this question, the Court explained that "[c]itizens may challenge compelled support of private speech, but have no First Amendment right not to fund government speech." *Id.* at 562. The plaintiffs then argued that pro-beef advertising campaign was not government speech because it was designed and controlled by a nongovernmental entity. *Id.* at 560.

The Supreme Court disagreed, holding that whether or not the advertising campaigns were designed by a private party, "[t]he message of the promotional campaigns is effectively controlled by the Federal Government itself." *Id.* First, Congress had established a "'coordinated program' of promotion, 'including paid advertising, to advance the image and desirability of beef and beef products.'" *Id.* at 561. Second, the Secretary of Agriculture had to approve every word used in the ad campaign. *Id.* The Court concluded by stating that "[w]hen, as here, the government sets the overall message to be communicated and approves every word that is disseminated, it is not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental sources in developing specific messages." *Id.* at 562.

Despite *Livestock Marketing Ass'n*, the Supreme Court has not set out a clear standard for determining when the government is speaking and when it is regulating private speech. *SCV*, 288 F.3d at 618. That said, certain principles can be distilled from the cases. First, for government speech to

exist, the government must, in the program at issue, be asserting some overarching message. *See Livestock Mktg. Ass'n*, 544 U.S. at 561 (focusing on a "'coordinated program' of promotion and an "overarching message"); *LSC*, 531 U.S. at 548 (distinguishing the subsidy in *LSC* from that in *Rust* on the grounds that the former lacked a "programmatic message"); *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1969 (2006) (Souter, J., dissenting) (referring to a "substantive position" when discussing government speech). Second, the degree of control the government exerts over its purported message is a factor in determining whether the government is speaking or regulating. *See Livestock Mktg. Ass'n*, 544 U.S. at 562 (finding relevant that the government "approves every word that is disseminated"). Third, government speech often exists in situations where the government funds the activity at issue or otherwise provides a benefit. *LSC*, 531 U.S. at 541 (describing the government speech doctrine in terms of government funding decisions); *Southworth*, 529 U.S. at 229 ("If the challenged speech here were financed by tuition dollars and the University and its officials were responsible for its content, the case might be evaluated on the premise that the government itself is the speaker."); *Rust*, 500 U.S. at 193-95. Finally, in addressing instances of alleged government speech, one must take into account the rationale for insulating the government from normal First Amendment scrutiny when it is speaking — political accountability through the electoral process. *Southworth*, 529 U.S. at 235.

### b. Fourth Circuit Government Speech Test

The Fourth Circuit has adopted a nonexhaustive four-factor test for determining when the government is speaking and when it is not. Where both the government and a private entity claim to be speaking, a court should examine:

> (1) the central "purpose" of the program in which the speech in question occurs; (2) the degree of "editorial control" exercised by the government or private entities over the content of the speech; (3) the identity of the "literal speaker"; and (4) whether the government or the private entity bears the "ultimate responsibility" for the content of

-13-

the speech.

*SCV*, 288 F.3d at 618 (citing *Wells v. City and County of Denver*, 257 F.3d 1132, 141 (10th Cir. 2001)).

Applying this test, the court in *SCV* held that the message on a specialty license plate constituted

private speech, and that therefore restrictions on the plate design were subject to First Amendment

scrutiny. *Id.* at 622. Two years later, the Fourth Circuit elaborated on the *SCV* test by recognizing that

in certain instances speech can be a mixture of government and private speech. *Planned Parenthood*

*of S.C., Inc.*, 361 F.3d at 795. The court then subjected the government's speech restrictions to First

Amendment scrutiny, the government character of the speech notwithstanding. *Id.* at 795.

The four-factor *SCV* test is consistent with the Supreme Court's subsequent decision in

*Livestock Marketing Ass'n*. In addressing the first *SCV* factor, courts focus on whether the purpose of

the government program is to disseminate a message or whether it is to raise revenue or regulate

conduct. This inquiry mirrors the Supreme Court's focus on an overarching governmental message. If

the central purpose of the program is to raise revenue, the first *SCV* factor weighs in favor of finding

that private speech is at issue. *SCV*, 288 F.3d at 619 ("[T]he purpose of the special plate program

primarily is to produce revenue while allowing, on special plates authorized for private organizations,

for the private expression of various views."). If the purpose of the program is, for example,

"specifically to promote the expression of a pro-life viewpoint," this favors a finding that government

is speaking. *Planned Parenthood of S.C.*, 361 F.3d at 793 (Michael, J., concurring); *see also Wells,* 257

F.3d at 1141-42 (finding that the purpose of a sign was thank sponsors)*; Knights of the Ku Klux Klan*

*v. Curators of the Univ. of Mo.*, 203 F.3d 1085, 1093 (8th Cir. 2000) (finding that the purpose of public

radio station's announcements was to acknowledge donors). The key is not the presence of a revenue-

production purpose, but the absence of a programmatic message. Likewise, if the purpose of a program

-14-

is primarily regulatory, it is not a case of the government expressing a particular viewpoint, at least not in the *Rust* sense.[4] *See LSC*, 531 U.S. at 552 (Scalia, J., dissenting) ("The LSC Act is a federal subsidy program, not a federal regulatory program, and 'there is a basic difference between the two.'").

The second *SCV* factor — degree of editorial control exercised by the government or private entities over the content of the speech — is consistent with the importance placed in *Livestock Marketing Ass'n* on the government having approved every word disseminated in the pro-beef advertising campaign. *See Livestock Mktg. Ass'n*, 544 U.S. at 562. The degree of editorial control is only important, however, when the purpose under the first factor is to disseminate a message, or where the central purpose is unclear. In the latter situation, the degree of editorial control can inform the "central purpose" analysis. In the former situation, where a programmatic message exists, the final three *SCV* factors help determine whether the message, when distributed, retains sufficient government character to avoid being attributed to a private speaker.

*Livestock Marketing Ass'n* did not address the third and fourth *SCV* factors or anything similar. But it also did not foreclose reliance on these factors. *Livestock Mktg. Ass'n*, 544 U.S. at 564 (refusing to address the validity of plaintiffs' argument that "[c]ommunications cannot be 'government speech,' . . . if they are attributed to someone other than the government"). The application of the third and fourth *SCV* factors is straightforward. If the identity of the literal speaker is a private party, the third factor favors a finding of private speech. If a private party bears the ultimate responsibility for the

---

[4]  Of course, any time the government regulates something it is making some sort of statement. For instance, when a state or local government limits the sale of alcohol on Sunday, it is expressing a message regarding the propriety of selling alcohol on that day. However, such a message would not seem to be what Supreme Court had in mind when it discussed an "overarching" or "programmatic" message. To hold otherwise would be to greatly expand the government speech doctrine beyond its  roots in *Rust* and *LSC*.

content of the speech, the fourth factor favors a finding that private speech is at issue. *Planned Parenthood of S.C.*, 361 F.3d at 794.

### c. Analysis

The defendant argues that it is not necessary to apply the *SCV* factors in this case because the State's "ownership" of the limited video lottery software is "inextricably bound with the legalization of video lottery machines." (Def.'s Mem. in Opp. 6-7.) The defendant correctly points out that the factors applied in *SCV* are neither exhaustive nor always applicable. *SCV*, 288 F.3d at 619. The defendant fails to indicate, however, the significance of its ownership interest for assessing whether government speech or private speech is implicated. The state of Virginia owned the license plates at issue in *SCV*, and ownership was not outcome determinative in that case. *Id.* at 621. In fact, the Fourth Circuit applied the four-factor test regardless of who technically owned the license plate. Insofar as ownership was relevant in *SCV*, it was ownership of the means of communication that was important. *Id.* at 621 ("We note that the court in *Wells* reasoned that ownership of the means of communication was a valid consideration in determining whether it contained government speech."). Here, the limited video lottery is the subject of any communication, not the means. At some level, though, the defendant's argument, read generously, has appeal. The argument goes as follows: the State regulates, controls, owns, and operates the video lottery. It is the State's lottery; therefore any advertising of the lottery would be the State's speech, and the State should be able to decide whether to advertise or not. Indeed, *Rust* has been characterized as standing for the principle that "when the government creates and manages its own program, it may determine the contents and limits of that program." *Planned Parenthood of S.C.,* 361 F.3d at 796 (Michael, J., concurring).

There are several problems with this line of reasoning, if that is, indeed, what the defendant

argues. First, the Supreme Court has cautioned against reading *Rust* too broadly. "Congress cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise." *LSC*, 531 U.S. at 547. Second, whether the State should be able to control advertising of the limited video lottery does not directly relate to whether government speech or private speech is implicated. Instead, it bears on the propriety of State efforts to regulate the plaintiffs, which is a different matter. Third, the State is not the only entity involved with the limited video lottery. By licensing the plaintiff's members to offer and support limited video lottery, the State has entered into a partnership of sorts with them. *See* W. Va. Code §§ 29-22B-701 to -707 (outlining the duties of LVL licensees). The State might not itself want to advertise limited video lottery, but this desire has little bearing on whether the plaintiff's members, who have a financial interest in the success of the video lottery, may do so. I will apply the *SCV* factors, bearing in mind that the factors are non-exclusive.

i) Central Purpose of the Program

In applying the *SCV* test, I must first consider the central purpose of the LVLA. Specifically, I must determine whether the purpose of the LVLA is primarily to disseminate an overarching message, or whether it is to raise revenue or otherwise regulate conduct. The defendant contends that the purpose of the LVLA is to establish "a single state owned and regulated video lottery thus allowing the State to collect revenue therefrom, control the operators of the machines, and stem the proliferation of gambling in the State." (Def.'s Mem. in Opp. 7 (quoting *Club Ass'n II*, 293 F.3d at 724).) The defendant does not, however, discuss why this purpose should weigh in favor of a finding of government speech. The plaintiff does not dispute the defendant's statement of the LVLA's purpose, but rather contends that "[t]he stated goal of the LVL program is aimed at producing revenue and

controlling conduct." (Pl.'s Reply 5.) I agree.

The stated purpose of the LVLA refers to revenue collection and regulating video lottery operators as important reasons for the LVLA's enactment. Also, in arguing for the creation of a state-controlled video lottery, Governor Wise emphasized revenue production and regulation. According to the Governor, his proposal would "do something no one has done before — reduce, restrict, and regulate the gray machines — and provide a steady new stream of income to finance the PROMISE Scholarship, other education efforts and the infrastructure necessary to build West Virginia." *Club Ass'n I,* 156 F. Supp. 2d at 607 (citing Governor Robert E. Wise, Jr., State of the State Address, State Capitol (Feb. 14, 2001)).

The substance of the LVLA also emphasizes revenue generation. One of the general duties of all LVL licensees is to "assist the commission in maximizing video lottery revenues." W. Va. Code § 29-22B-701(4). The LVLA contains four sources of revenues: licensing fees, permit fees, bidding fees, and the State's share of video lottery revenue. *Club Ass'n I*, 156 F. Supp. 2d at 608. As Judge Haden noted in *Club Ass'n I*, the LVLA license charges are imposed primarily for revenue production. *Id.* at 613. The LVLA has apparently succeeded. According to a statement made by the defendant in the West Virginia Limited Adult Video Lottery Newsletter, in fiscal year 2004 limited video lottery generated almost $242 million in income for West Virginia. (Pl.'s Mem. Attach. 4.) As noted in *SCV,* though the fact that a program produces revenue for the State is not conclusive as to its purpose, the net financial impact of a program on the State's fisc is a factor to assess. 288 F.3d at 619.

In contrast, there is little evidence that the State was trying to "speak" when it enacted the LVLA. The defendant asserts that the LVLA was enacted in part to "stem the proliferation of gambling in the state." The only plausible governmental message that can be gleaned from this is an

-18-

anti-gambling or anti-video-lottery message. Given that the LVLA authorizes a state-run limited video lottery, any anti-gambling or anti-video-lottery message is mixed at best. It is not the type of overarching message that justifies a finding of government speech. Moreover, the defendant conceded in its memorandum in opposition that "the State has not taken any action to promote an 'anti-gambling' position," thereby denying the existence of the only programmatic message that could possibly be found in the statute's purpose. (Def.'s Mem. in Opp. 8.) Finally, in the October, November, December, 2004 edition of the West Virginia Limited Adult Video Lottery Newsletter, the defendant states that "[t]he popularity of Limited Video Lottery continues to grow, and public acceptance is increasing thanks to the cooperation shown by all in the removal of gambling-related signage." (Pl.'s Mem. Attach. 4.) This suggests that the restrictions on limited video lottery advertising were not put in place to help the State tailor a message regarding the proliferation of gambling, but rather to make the limited video lottery more palatable to the public.

In light of the above, I **FIND** that the central purpose of the LVLA is to produce revenue and regulate the video lottery, not to disseminate an overarching governmental message. I further **FIND** that the first *SCV* factor favors a private speech designation.

### ii) Degree of Editorial Control

Having found that the LVLA was not intended to disseminate a programmatic message, there is little reason to apply the second *SCV* factor. Without a message, there is nothing over which the State can exercise editorial control. By banning limited video lottery advertising, the State is not "editing" its own message, but rather regulating the speech of the LVL retailers. In circumstances such as these, application of the second SCV factor confuses rather than clarifies the analysis.

The second *SCV* factor is useful in situations where the central purpose of the statute or

regulatory regime is unclear. The degree of editorial control exercised by the government informs the analysis of whether there is a programmatic message. This factor can help distinguish between situations where a government program is designed to "facilitate private speech" and those where it is designed to "promote a governmental message." *See LSC*, 531 U.S. at 541; *Rosenberger*, 515 U.S. at 834. The more control the government exercises over the content of the speech, more likely the central purpose of the program is to promote a government message. The Fourth Circuit's license plate cases illustrate this principle. In *SCV*, applicants for special license plates designed the content of the special plate, and the state could either accept or reject the design. 288 F.3d at 620-21. That the state exercised little control over the plate's content strengthened the court's conclusion under the first *SCV* factor that the central purpose of the license plate program was not to promote a government message, but rather to raise revenue by allowing parties to buy a forum for their particular messages. *Id.* at 619-20. In *Planned Parenthood of S. C.*, "the idea for a Choose Life plate originated with the State, and the legislature determined that the plate [would] bear the message 'Choose Life.'" 361 F.3d at 793. This extensive editorial control was consistent with, and strengthened, the court's finding that the purpose of the license plate program at issue was to "promote the government's expression of a pro-life viewpoint." *Id.* at 793.

The second *SCV* factor is also useful in determining whether a given governmental message retains sufficient government character to avoid being attributed to a private speaker. The government does not have to identify itself when it speaks. *See Livestock Mktg. Ass'n*, 544 U.S. at 564 n.7 (noting that "correct focus is not on whether the ads' audience realizes the Government is speaking"). First Amendment issues may arise, however, when viewers identify government speech as private speech. *Id.*

Importantly, the situations where the second *SCV* factor is useful are those where the existence of a programmatic is presumed or at least ambiguous. There is a correlation between the presence of a programmatic message and whether the second *SCV* factor favors a finding of government or private speech. When courts determine that the first *SCV* factor favors a finding of government speech, they usually also find that the second *SCV* factor weighs in favor of government speech, and vice versa. *See, e.g., Planned Parenthood of S.C.*, 361 F.3d at 793; *SCV*, 288 F.3d at 619-21; *Wells*, 257 F.3d at 1141-42; *Knights of the Ku Klux Klan*, 203 F.3d at 1093-94. This trend is consistent with my notion that without a programmatic message, the second *SCV* factor muddies the government speech analysis. Here, I have found that the LVLA has no programmatic or overarching message. That being the case, I **FIND** that the second *SCV* factor is inapplicable.

### iii) Identity of the Literal Speaker

Turning to the identity of the "literal speaker" in this case, the defendant argues that the State is the speaker because it owns the product about which the advertising is concerned. Again, the defendant does not explain how its ownership interest makes the State the literal speaker of limited video lottery advertising. It is not difficult to think of situations where the owner of an item is different from the person speaking about the item. When an auctioneer solicits bids on items at an estate sale, for example, the auctioneer is the person literally speaking, ownership of the items notwithstanding.

The ownership relevant in the context of the third *SCV* factor is the ownership of the means of communication. *SCV*, 288 F.3d at 621. Here, the advertising materials that the plaintiff's members wish to use are the means of communication. Assuming that the LVL retailers are the ones who will be paying for limited video lottery advertising, and that these retailers will use the names of their own businesses in any such ads, the literal speakers would be the LVL retailers, not the State. The LVLA

also restricts the corporate names that LVL retailers can use. Common sense suggests that the LVL retailers are the literal speakers when their own business names are at issue. Similarly, passersby who view limited video lottery advertising will likely assume that the private establishment doing the advertising is the speaker, not the State of West Virginia. This seems like a reasonable assumption, if the Tri-State Racetrack and Gaming Center advertisement is a fair example of what LVL retailers want to do. (Pl.'s Mem. Attach. 2.) In the ad, the word "Tri-State" appears three times while the "West Virginia Lottery" symbol appears once. Further, the "West Virginia Lottery" symbol is dwarfed in size by all the other writing in the advertisement.

Because the plaintiff's members will initiate the advertising, will presumably pay for the advertising, and will presumably use their corporate names in the advertising, I **FIND** that the literal speakers of the advertising in which the LVL retailers wish to engage are the LVL retailers themselves, not the State. Accordingly, I **FIND** that the third *SCV* factor favors a private speech designation.

### iv) Who Bears Ultimate Responsibility for the Speech

The final task I must undertake is to determine whether the government or the private entity bears the ultimate responsibility for the content of the speech. The LVLA requires that all LVL licensees (including LVL retailers) "[h]old the commission and this state harmless from and defend and pay for the defense of any and all claims that may be asserted against a license holder, this state or the commission and its employees arising from the license holder's participation in the video lottery system authorized by this article." W. Va. Code § 29-22B-701(3). As a result, LVL retailers bear ultimate legal responsibility for any problems their advertising may cause.

The defendant contends that the State bears ultimate responsibility for any advertising because

"but for its legalization of the video lottery machines, there would be no issue as to advertising and promotion of the lottery." (Def.'s Mem. in Opp. 8.) It is true that the State is responsible for the existence of the lottery. But it does not follow that the State is therefore responsible for speech about the lottery put forth by private LVL retailers. The only sense in which the State is responsible for the content of the speech is that if the public dislikes the advertising, the public will blame the State for permitting it. If this were the case, however, the fourth *SCV* factor would always favor the government because the government can always be held responsible for its regulatory decisions.

Given the LVLA's assignment of responsibility to the LVL retailers, I **FIND** that the ultimate responsibility for limited video lottery advertising is borne by plaintiff's members, LVL retailers. Consequently, I **FIND** that the fourth *SCV* factors a private speech designation.

### d. Conclusion

The three applicable *SCV* factors, including the key "central purpose" factor, weigh in favor of finding that the State is regulating private speech, not speaking. I therefore **FIND** that the government speech doctrine does not apply. Accordingly, the LVLA's advertising restrictions will be subject to the same First Amendment scrutiny as other government-imposed speech restrictions.

### 2. Commercial Speech

The plaintiff alleges that the advertising restrictions contained in the LVLA and its associated legislative rules violate the First Amendment as applied to West Virginia through the Fourteenth Amendment. (First. Am. Compl. ¶ 15.) Specifically, the plaintiff argues that the advertising restrictions do not satisfy the Supreme Court's test for assessing restrictions on commercial speech. (Pl.'s Mem. 7.) The defendant, however, contends that if the court the finds, as I have, that the case involves private speech, the plaintiff's claim must fail because it cannot prove viewpoint

-23-

discrimination. (Def.'s Mem. in Opp. 8.) Regardless of the parties contentions, viewpoint discrimination is not the appropriate framework for this case. The plaintiff does not claim improper viewpoint discrimination in its motion for preliminary injunction; it contests the advertising restrictions as impermissible limitations on commercial speech. Moreover, the parties do not dispute that the speech restricted in this case — advertising and promotions, corporate names containing the phrase "video lottery" or words associated with gambling, and gambling symbols — is commercial speech. Thus, the most appropriate framework for evaluating the advertising restrictions imposed on LVL retailers is the test outlined in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980).

For over twenty-five years, the Supreme Court has recognized that the First Amendment protects commercial speech. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 554 (2001). There is no question that this includes advertising; the case that established commercial speech protection itself dealt with advertising. *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council*, 425 U.S. 748 (1976). There, the Court reasoned that "[a]dvertising, however tasteless and excessive it sometimes may seem, is nonetheless dissemination of information." *Id.* at 765. This information, the Court continued, is "indispensable to the proper allocation of resources in a free enterprise system" and therefore "indispensable to the formation of intelligent opinions as to how that system ought to be regulated or altered." *Id.* Because of the importance of commercial speech, the Court has "rejected the 'highly paternalistic' view that government has complete power to suppress or regulate commercial speech." *Cent. Hudson*, 447 U.S. at 562. "Even when advertising communicates only an incomplete version of the relevant facts, the First Amendment presumes that some accurate information is better than no information at all." *Id.* at 562 (citing *Bates v. State Bar of Ariz.*, 433 U.S. 350, 374 (1977)).

Nevertheless, not all regulation of commercial speech is unconstitutional. *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367 (2002). Speech proposing a commercial transaction "occurs in an area traditionally subject to government regulation." *Lorillard Tobacco Co.*, 533 U.S. at 554 (citing *Cent. Hudson*, 447 U.S. at 562). Consequently, the Constitution accords commercial speech less protection than is afforded other types of constitutionally guaranteed expression. *Cent. Hudson*, 447 U.S. at 563. Commercial speech restrictions are subject to intermediate scrutiny, the governing framework being that set forth in *Central Hudson*. *See W. States Med. Ctr.*, 535 U.S. at 367.

The *Central Hudson* test for assessing the constitutionality of commercial speech restrictions has four prongs:

> Under the test we ask as a threshold matter whether the commercial speech concerns unlawful activity or is misleading. If so, then the speech is not protected by the First Amendment. If the speech concerns lawful activity and is not misleading, however, we next ask "whether the asserted governmental interest is substantial." If it is, then we "determine whether the regulation directly advances the governmental interest asserted," and, finally, "whether it is not more extensive than is necessary to serve that interest."

*W. States Med. Ctr.*, 535 U.S. at 367 (quoting *Cent. Hudson*, 447 U.S. at 566) (internal citations omitted). The latter three prongs must be answered in the affirmative for the speech restrictions to be constitutional. *Id.* at 367.

The defendant argues that *Central Hudson* is not applicable because the facts of that case, and of other cases where speech restrictions were struck down, differ materially from the facts present in this case. (Def.'s Mem. in Opp. 2-5.)  The defendant points out that in *Central Hudson*, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996), and *Greater New Orleans Broadcasting Ass'n, v. United States*, 527 U.S. 173 (1999), the products advertised were owned by private parties. Here, in contrast, the State has an ownership interest in the "product," i.e., limited video lottery. (Def.'s Mem. in Opp.

3.) The defendant also maintains that unlike in *Central Hudson*, etc., the speech here cannot "fairly be characterized as private speech." (Def.'s Mem. in Opp. 3.) These distinctions are irrelevant. None of the cases cited relied on private ownership of the products at issue in striking down advertising restrictions. Moreover, *Central Hudson* and *44 Liquormart* involved electricity and alcohol, respectively. These are both products that are heavily regulated, so the fact that the State regulates the limited video lottery extensively does not distinguish the present case. *Cf. Cent. Hudson*, 447 U.S. at 567 n.10 ("Several commercial speech decisions have involved enterprises subject to extensive state regulation."). The only difference here is that the State technically "owns," for the purposes of the West Virginia Constitution, the lottery by retaining a proprietary interest in the video lottery software. *See Development Authority*, 588 S.E.2d at 669. Also, the defendant's reliance on the presence of "private commercial speech" in the cases it cites merely rehashes the government speech argument I rejected previously in this opinion.

The defendant's efforts to avoid application of *Central Hudson* are in vain, and I will now apply the four-pronged test.

a. *Regulation of Truthful, Nonmisleading Speech*

As a threshold inquiry, I must determine whether the advertising at issue concerns an unlawful activity or is misleading. If so, the advertising is not protected by the First Amendment. The LVLA legalized licensed limited video lottery. *See* W. Va. Code §§ 29-22B-101 to -1903. Plaintiff's members are licensed LVL retailers. (Pl.'s Mem. 1.) The advertising in this case, therefore, concerns a lawful activity, a fact not disputed by the defendant.

The defendant instead asserts that the "lack of agreement" between the parties as to whether the advertising is misleading prevents  the plaintiff from meeting the first *Central Hudson* prong.

(Def.'s Mem. in Opp. 2-3.) "While not all the speech at issue is misleading," the defendant maintains, "some of it is." (Def.'s Mem. in Opp. 2.) The defendant is particularly concerned that the use of corporate names containing words associated with gambling, such as "casino" and the "winning circle," could possibly give a misleading impression to limited video lottery patrons of the activities taking place and the likelihood of winning. (Def.'s Mem. in Opp. 2.)

It is clear that the State can regulate advertising that is "inherently likely to deceive or where the record indicates that a particular form or method of advertising has in fact been deceptive." *In re R. M. J.*, 455 U.S. 191, 202 (1982). At the same time, "it is well established that 'the party seeking to uphold a restriction on commercial speech carries the burden of justifying it.'" *Edenfield v. Fane*, 507 U.S. 761, 770 (1993) (citing *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 71 (1983)). It is not enough that the parties disagree about whether the speech is misleading; the defendant must establish that the advertising the State has banned is misleading.

Based on the record before me, I cannot find that the speech banned by the State is inherently misleading, at least without any evidence of the context in which it would be used. The LVLA prohibits LVL licensees from using the words "video lottery" in "the name of the approved location, or in any directions or advertising visible from outside the retailer's establishment." W. Va. Code § 29-22b-702(14). I fail to see how the phrase "video lottery" is inherently misleading in an advertisement for an establishment that legally offers video lottery. Likewise, it is not *inherently* misleading for a business to use words commonly associated with gambling in its corporate or business name when gambling via limited video lottery legally occurs there. Moreover, even a cursory glance at the list of words that LVL retailers are prohibited from using demonstrates that many of the

words are not inherently misleading.[5] (Pl.'s Mem. Attach. 1.) For instance, I cannot find that the words "amusement," "progressive," or "wild" are inherently misleading.

Nor has the defendant offered any evidence that the prohibited terms are actually misleading. Instead it notes that the Commission has banned the terms because of the *possibility* that they are misleading. (Def.'s Mem. in Opp. 2.)  The Supreme Court has explained, however, that the "rote invocation of the words 'potentially misleading'" cannot supplant the defendant's burden "to 'demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.'" *Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*, 512 U.S. 136, 146 (1994) (quoting *Edenfield v. Fane*, 507 U.S. 761, 771 (1993)). Some of the prohibited terms do seem to have the potential to be misleading. "Rags to Riches" and "The Cash Shop" are obvious examples. (Pl.'s Mem. Attach. 1.) That being said, "States may not place an absolute prohibition on certain types of potentially misleading information, . . . if the information also may be presented in a way that is not deceptive." *In re R. M. J.*, 455 U.S. at 203. The overly broad reach of the State's ban is exemplified by it having banned "the HRC Lounge" because "HRC *could* stand for High Rollers Club." (Pl.'s Mem. Attach. 1 (emphasis added).) Similarly, the State prohibits the name "Rainbow Club" because "the word 'rainbow' is symbolic for luck," even though it is quite possible "rainbow" could have other symbolic meanings. (Pl.'s Mem. Attach. 1.)

---

[5] The list of prohibited terms attached to plaintiff's memorandum in support of its motion for preliminary injunction is similar to the list attached to the plaintiff's first amended complaint. In its response to the first amended complaint, the defendant states that the list attached to the complaint is "incomplete and does not appear to include the current list." (Def.'s Resp. to First Am. Compl. ¶ 11.) I will use the list attached to plaintiff's memorandum for two reasons. First, the defendant did not object to the list in its response to plaintiff's memorandum. Second, though the list may not be complete, the defendant concedes that the terms actually on the list are indeed prohibited. (Def.'s Resp. to First Am. Compl. ¶ 11.)

-28-

There is also no indication in the LVLA or the legislative rules that the advertising restrictions were put in place to prevent consumers from being misled. What evidence there is suggests that the terms were banned not because of their potential to mislead, but because of their potential to advertise. Use of the phrase "Lots-O-Fun" is prohibited because "lot" is "indicative of lottery." (Pl.'s Mem. Attach. 1.) The word "lottery," however, does not give a misleading impression of the activities that take place at a LVL retailer's establishment. *See also* Governor's Exec. Order No. 21-03, Oct. 29, 2003, available at http://www.state.wv.us/lottery/exectorder.htm (last visited September 26, 2007) (noting the propensity of LVL retailers to indirectly advertise by using gambling terms in their corporate names).

This is not to say that the State cannot regulate misleading advertising. But the defendant's rote invocation of the possibility that some speech may be misleading is insufficient to meet its burden of demonstrating that the speech in which the plaintiff's members wish to engage is deceptive, untruthful, or misleading. I **FIND** that on the record before me that the plaintiff is likely to satisfy the first prong of the *Central Hudson* test.

### b. Substantiality of the Government's Asserted Interest

The second prong of *Central Hudson* requires that I determine whether the asserted governmental interest served by advertising restrictions is substantial. *Greater New Orleans Broad. Ass'n,* 527 U.S. at 185. The defendant bears the burden of identifying a substantial interest, *Greater New Orleans Broad. Ass'n*, 527 U.S. at 183, and "[u]nlike rational-basis review, the *Central Hudson* standard does not permit us to supplant the precise interests put forward by the State with other suppositions." *Edenfield*, 507 U.S. at 768.

Having relied almost exclusively on its government speech argument, the defendant does not

put forward any interest as justification for the LVLA's advertising restrictions. A strong argument could be made that the defendant has not met its burden of identifying a substantial government interest. The defendant has, however, identified the purpose of the LVLA as being to raise revenue and stem the proliferation of gambling. Common sense suggests that restricting limited video lottery advertising will not result in an increase in revenue. Thus, the only interest the defendant could possibly assert as "substantial" is the State's interest in stemming the proliferation of gambling.

I will assume, given that this analysis is in the context of a motion for a preliminary injunction, that the State's interest in stemming the proliferation of gambling is substantial. The courts have recognized that governments may assert a substantial interest in alleviating the social costs associated with gambling. *Greater New Orleans Broad. Ass'n*, 527 U.S. at 185-86; *Posadas de P.R. Assoc. v. Tourism Co. of P.R.*, 478 U.S. 328, 340-41 (1986); *Martin v. Stewart*, No. 06-1829, 2007 WL 2429847, at *11 (4th Cir. Aug. 29, 2007) (Wilkinson, J., dissenting). The substantiality of this interest is tempered, however, by the State having tied the West Virginia budget to revenue derived from limited video lottery. As was the case in *Greater New Orleans Broadcasting Ass'n*, the "crosscurrents in the scope and application" of the speech restriction will make it more difficult for the State to satisfy the remaining *Central Hudson* prongs. *Greater New Orleans Broad. Ass'n*, 527 U.S. at 187. I **FIND** that "stemming the proliferation of gambling" is a substantial state interest.

### c. Direct Advancement of the Government's Asserted Interest

In order for the advertising restrictions at issue in this case to pass constitutional muster, "the speech restriction [must] directly and materially advance[] the asserted governmental interest." *Id.* at 188. The defendant's burden "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the

harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 770. When the government's means is the wholesale suppression of truthful, nonmisleading information, the need for the government to prove direct advancement is particularly great. *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. at 505 (Stevens, J., concurring in judgment). The third *Central Hudson* prong is "critical; otherwise, 'a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression.'" *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995) (quoting *Edenfield*, 507 U.S. at 771). The defendant can meet its burden by reference to studies or anecdotes or, in some instances, history, consensus, and common sense. *Lorillard Tobacco Co.*, 533 U.S. at 555 (quoting *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995)).

The defendant presents no evidence that the restrictions on limited video lottery advertising have the effect of directly and materially stemming the proliferation of gambling in West Virginia. In *Lorillard Tobacco Co.*, the Court relied on the Attorney General's "ample documentation" on the effect of targeted advertising campaigns on smokeless tobacco use in finding that the government had satisfied the third *Central Hudson* prong. *Id.* at 561. Here the defendant has offered no evidence, ample or otherwise, that the advertising restrictions directly and materially contribute toward stemming the proliferation of gambling.

In the absence of evidence or argument, I can only rely on history, consensus, and common sense. The idea that restricting limited video lottery advertising will decrease demand for limited video lottery and therefore slow the proliferation of gambling has intuitive appeal. This appeal is reflected in *Central Hudson* itself, where the court found "an immediate connection between advertising [of electricity] and demand for electricity." *Cent. Hudson*, 447 U.S. at 569; *see also United States v. Edge*

*Broad. Co.*, 509 U.S. 418, 434 (1993) ("If there is an immediate connection between advertising and demand, and the federal regulation decreases advertising, it stands to reason that the policy of decreasing demand for gambling is correspondingly advanced."); *Posadas*, 478 U.S. at 341-42.

Recently, however, the Court has questioned the "directness" of the relationship between advertising restrictions and demand. In *Greater New Orleans Broadcasting Ass'n*, the Court reasoned that "[w]hile it is no doubt fair to assume that more advertising would have some impact on overall demand for gambling, it is also reasonable to assume that much of that advertising would merely channel gamblers to one casino rather than another." 527 U.S. at 189. Similarly, it is certainly possible that the effect of the LVLA's advertising restriction is to funnel gamblers away from limited video lottery and toward other forms of gambling that are advertised, such as racetrack video lottery or scratch-off instant lottery games. In that case, the effect of the advertising restriction would be to shift the location of gambling, not stem its proliferation.

The degree to which the advertising restrictions at issue stem the proliferation of gambling is further undercut by the "irrationality" of the State's lottery scheme. Courts addressing the third *Central Hudson* prong have considered regulatory "irrationality" to be a significant factor. *See, e.g.*, *Coors Brewing Co.*, 514 U.S. at 488-89. In *Greater New Orleans Broadcasting Ass'n*, the Supreme Court held that a federal statute that prohibited broadcast advertising of private casino gambling was unconstitutional when applied to radio or television stations located in states where such gambling was legal. 527 U.S. at 176. While private casinos could not use broadcast advertising, other types of casinos, such as tribal, government-operated, and nonprofit casinos, were exempt from the advertising restriction. *Id.* at 190. The Court pointed out that "any measure of the effectiveness of the Government's attempt to minimize the social costs of gambling cannot ignore Congress' simultaneous

encouragement of tribal casino gambling, which may well be growing at a rate exceeding any increase in gambling or compulsive gambling that private casino advertising could produce." *Id.* at 189. The Court further reasoned that the broadcast advertising prohibition "and its attendant regulatory regime is so pierced by exemption and inconsistencies that the Government cannot hope to exonerate it." *Id.* at 190.

The regulation of the various West Virginia Lottery products is similarly problematic. It is unlikely that the LVLA's advertising restrictions will do much to slow the proliferation of gambling when the State allows advertising of other forms of gambling. The plaintiff alleges, and the defendant does not dispute, that the State permits the advertising of "instant" lottery games, online numbers games such as powerball, and racetrack video lottery games. (Pl.'s Mem. 2-3 (quoting W. Va. Code R. § 179-5-33.6).) Likewise, an instant lottery retailer can lose its license if it fails to display required advertising. W. Va. Code R. § 179-1-4.5.d.3.I (2004). It is also difficult to believe that the LVLA's advertising restrictions will be able to stem the proliferation of gambling when, at the same time, Mountaineer Racetrack and Gaming Resort received a $177,196 grant to continue its "We'll Leave the Slots on For Ya!" ad campaign from the West Virginia Tourism Commission, and when Charles Town Races and Slots received a $298,492 grant for a multimedia ad campaign. (Pl. Mem. Attach. 3 (Phil Kabler, *Greenbrier Reopening Campaign Leads Tourism Advertising Grants*, The Charleston Gazette, Mar. 16, 2007, at 6A).)

The irrationality of the State's regulatory regime, along with the defendant's failure to provide any evidence that the advertising restrictions directly and materially advance the only substantial interest the defendant has arguably identified, stemming the proliferation of gambling, lead me to **FIND** that the defendant is unlikely to meet its burden of proving that the advertising restrictions at

issue directly and materially advance a substantial government interest.

### d. Restriction "No More Restrictive Than Necessary"

Even if the advertising restrictions did directly advance a substantial government interest, it would be of no avail because the advertising restrictions are not sufficiently tailored to serve any identifiable government interest. The fourth prong of the *Central Hudson* test asks whether the speech restriction is "not more extensive than necessary to serve" the interests that support it. *Cent. Hudson*, 447 U.S. at 566. "The Government is not required to employ the least restrictive means conceivable, but it must demonstrate narrow tailoring of the challenged regulation to the asserted interest." *Greater New Orleans Broad. Ass'n*, 527 U.S. at 188. The fit between the speech regulation and the governmental interest need not be perfect, only reasonable. *Bd. of Trustees of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989). The standard is not the "rational basis" test used in the equal protection context. Rather, "the challenged regulation should indicate that its proponent 'carefully calculated the costs and benefits associated with the burden on speech imposed by its prohibition.'" *Greater New Orleans Broad. Ass'n*, 527 U.S. at 188 (internal citations omitted). In addressing the final *Central Hudson* prong, the Supreme Court has "made clear that if the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech, the Government must do so." *W. States Med. Ctr.*, 535 U.S. at 371. The breadth of the regulation is a relevant consideration. *Lorillard Tobacco Co.*, 533 U.S. at 561 (finding that the "broad sweep of the regulations" contributed to their failing the fourth *Central Hudson* prong).

In several cases, the fact that speech restrictions were used to advance interests that could just as easily have been addressed by nonspeech-related alternatives contributed to the speech restrictions being struck down for failing to satisfy the fourth *Central Hudson* prong. In *Greater New Orleans*

*Broadcasting Ass'n*, for instance, the existence of nonspeech means of alleviating the social costs of casino gambling indicated that the advertising restriction at issue in that case was not sufficiently tailored. 527 U.S. at 192. These alternatives included "a prohibition or supervision of gambling on credit; limitations on the use of cash machines on casino premises; controls on admissions; pot or betting limits; location restrictions; and licensing requirements." *Id.* In *Rubin v. Coors Brewing Co.*, the Court invalidated a statute in part because there existed regulatory alternatives that could advance the Government's asserted interest in preventing beer "strength wars" in a manner less intrusive to First Amendment rights than a ban on disclosing alcohol content in advertising. 514 U.S. at 490-91. "[D]irectly limiting the alcohol content of beers" was one such alternative. *Id.*; *see also 44 Liquormart*, 517 U.S. at 507 (Stevens, J., concurring in judgment) ("It is perfectly obvious that alternative forms of regulation that would not involve any restriction on speech would be more likely to achieve the State's goal of promoting temperance.").

As in those situations, there are a number of ways for the State to stem the proliferation of gambling without restricting speech. The State could, for example, further restrict the number of bids for new video terminals or eliminate new video terminals altogether. The State could also increase licensing fees, or decrease the number of machines each retailer is allowed to possess. The State could engage in anti-gambling speech or promote gambling education programs. Though the LVLA has provisions designed to limit limited video lottery, the defendant does not explain why it is also necessary to prohibit LVL retailers from advertising. *Thompson v. Western States Medical Center* made clear that "[i]f the First Amendment means anything, it means that regulating speech must be a last — not first — resort." 535 U.S. at 373.

The sheer breadth of the scope of the LVLA's advertising restrictions also indicate that it

cannot survive constitutional scrutiny. Many of the advertising restrictions struck down by the Supreme Court were significantly narrower than the restrictions placed on limited video lottery advertising in the instant case. The restriction described as a "complete ban" in *44 Liquormart* prohibited not advertising, but rather "advertising the retail price of alcoholic beverages." *44 Liquormart*, 517 U.S. at 489, 516. Likewise, the restrictions struck down in *Lorillard Tobacco Co.* were not prohibitions on all advertising; the regulations prohibited outdoor advertising of smokeless tobacco and cigars within 1,000 feet of a school and indoor advertising for smokeless tobacco lower than five feet from the floor. 533 U.S. at 556, 566. The LVLA, however, *completely* prohibits LVL retailers from advertising or promoting limited video lottery, with the exception of a small state-created sign that mentions not limited video lottery, but "West Virginia Lottery Products." That the LVLA restrictions are broader than other speech restrictions is not, of course, dispositive. The breadth of the advertising restrictions do, however, suggest that the restriction could perhaps be less extensive. *See Lorillard Tobacco Co.*, 533 U.S. at 571-72 (Kennedy, J., concurring in part and concurring in judgment) (concluding that "sweeping ban" in that case was "obviously" overbroad).

The defendant strenuously argues at several points its brief that "absent State ownership and control there would be no lawful video lottery in West Virginia, and as a consequence, advertising and promotion would not be an issue." (Def.'s Mem. in Opp. 5.) Insofar as  the defendant is arguing that the "greater" power to completely ban video lottery, which the State presumably has, includes the "lesser" power to regulate speech about video lottery, the defendant is incorrect. This argument was mentioned in dicta in *Posadas* and was squarely rejected in *Greater New Orleans Broadcasting Ass'n.* "[T]he power to prohibit or to regulate particular conduct does not necessarily include the power to prohibit or regulate speech about that conduct." *Greater New Orleans Broad. Ass'n*, 527 U.S. at 193.

For the reasons set forth above, I **FIND** that the defendant is unlikely meet its burden under the fourth prong of the *Central Hudson* test.

3. Conclusion

Based on the above analysis, I **FIND** that it likely the speech at issue in this case is private speech, not government speech.  I also **FIND** it unlikely that the defendant meets its burden of proving that the advertising restrictions at issue meet *Central Hudson*'s requirements.  Therefore, I **FIND** that the plaintiff is likely to succeed on the merits.

**B. Likelihood of Irreparable Injury to Plaintiff**

The Supreme Court has explained that "loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury." *Giovani Carandola, Ltd., v. Bason*, 303 F.3d 507, 520-21 (4th Cir. 2002) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  Thus, having found that the plaintiff is likely to succeed in its First Amendment challenge to the advertising restrictions, I **FIND** that it is likely to suffer irreparable injury if an injunction is not issued.

**C. Likelihood of Harm to the Defendant**

As for the potential harm to the defendant if an injunction is issued, the Fourth Circuit has found that "a state 'is in no way harmed by [the] issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional.'" *Carandola*, 303 F.3d at 521. In fact, "the system is improved by such an injunction." *Id.*  I **FIND** potential harm to the defendant to be unlikely.

**D. Public Interest**

The final requirement for granting a preliminary injunction is that it serve the public interest. "[U]pholding constitutional rights surely serves the public interest." *Carandola*, 303 F.3d at 521.  The

-37-

Court discussed at length the public's interest in the free flow of information in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748 (1976). It found that a state's paternalistic assumption that the public will use truthful, nonmisleading commercial information unwisely cannot justify a decision to suppress it.  The Court stated:

> There is, of course an alternative to this highly paternalistic approach.  That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than close them. . . . It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available that the First Amendment makes for us.

*Id.* at 770.

It is also significant that his case involves a complete ban on commercial speech. The Court in *Central Hudson* remarked that "in recent years this Court has not approved a blanket ban on commercial speech unless the expression itself was flawed in some way, either because it was deceptive or related to unlawful activity." 447 U.S. at 566 n.9. The rationale for reviewing with special care complete bans on commercial speech is that "[i]n those circumstances, a ban on speech could screen from public view the underlying governmental policy." *Id.* When the effect of a speech restriction is to keep important policy issues "out of sight, out of mind," the restriction runs counter to the purpose of the First Amendment - to "'assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)).

Whether intentional or not, the effect of the ban on limited video lottery advertising is to hide the extent of this form of gambling from the public eye. Video lottery, and gambling generally, have been, and continue to be, controversial issues in West Virginia. Some West Virginians undoubtedly believe that it is possible to use a state-run lottery to produce revenue while at the same time limiting

-38-

the negative effects associated with gambling. Others may question the wisdom of establishing a "massive, statewide, government-operated gambling system" that uses "thousands of decentralized, privately managed sites" and "thousands of gambling devices that are known to be especially dangerous and addictive." *W. Va. ex rel. Cities of Charleston and Huntington v. W. Va. Econ. Dev. Auth.*, 588 S.E.2d 655, 674 (W. Va. 2003) (Starcher, C.J., concurring). There are also concerns that it will be "impossible for future generations to cancel, revamp, or restrict this system, because of the legal obligation to pay off bonds that are based on gambling revenues." *Id.*

Lifting the LVLA's ban on commercial speech will bring limited video lottery into the light, thereby providing important information to those who want to play, and those who want to protest. I therefore **FIND** that granting the injunction serves the public interest.

## IV. Conclusion

For the reasons outlined above, the court **GRANTS** the plaintiff's motion for a preliminary injunction.  The court **ENJOINS** the defendant from enforcing the advertising ban contained in West Virginia Code § 29-22B-702(13) and (14) and West Virginia Code of State Rules § 179-5-33.1 to 4. The Court **DIRECTS** the plaintiff to post security in the amount of $10,000 for the payment of costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

The court further **DIRECTS** the Clerk to forward copies of this Written Opinion and Order to counsel of record and any unrepresented party and to publish the decision on the court's website at www.wvsd.uscourts.gov.

ENTER:          September 28, 2007


Joseph R. Goodwin, Chief Judge